**IN THE SUPREME COURT OF PENNSYLVANIA**
**EASTERN DISTRICT**

**TODD, C.J., DONOHUE, DOUGHERTY, WECHT, MUNDY, BROBSON, JJ.**

| | | |
|---|---|---|
| N.W.M. AND E.M., MINORS, THROUGH THEIR PARENTS AND NATURAL GUARDIANS, J.M., N.M., AND J.A.M., | : | No. 25 EAP 2022 |
| | : | |
| | : | Appeal from the Judgment of |
| | : | Superior Court entered on 2/01/2022 |
| Appellees | : | at No. 1532 EDA 2020 |
| | : | Reversing/Remanding the order |
| | : | entered on 7/08/2020 in the Court of |
| v. | : | Common Pleas, Philadelphia County, |
| | : | Civil Division at No. 200300399. |
| | : | |
| PATRICE LANGENBACH AND | : | ARGUED: September 14, 2023 |
| DEFENDER ASSOCIATION OF | : | |
| PHILADELPHIA, | : | |
| | : | |
| | : | |
| Appellants | : | |

**OPINION**

**JUSTICE WECHT**                                          **DECIDED: May 31, 2024**

Immunity from civil liability is an "exceptional protection."[1]  When courts extend such protection, they displace remedies otherwise available at law, a step not lightly taken.  Here, we consider whether to extend absolute, quasi-judicial immunity in tort to attorneys appointed as guardians *ad litem* ("GAL") to represent children in juvenile dependency proceedings.[2]  In such proceedings, GALs represent the best interests of children, and, absent any conflict of interest, the legal interests of those children as well.  GALs in juvenile dependency cases serve an important and unique role.  That role

---

[1]     *Scampone v. Highland Park Care Ctr., LLC*, 57 A.3d 582, 596 (Pa. 2012).

[2]     *See* 42 Pa.C.S. § 6311; Pa.R.J.P. 1151, 1154.

consists of legal advocacy, not adjudication, and, as such, confers no quasi-judicial immunity on GALs. We hold as well that our Superior Court, as an intermediate appellate tribunal, is authorized to address such claims when squarely presented. We affirm the intermediate panel's order, which reversed the trial court's decision, a decision that had relied on assertions of quasi-judicial immunity. We remand to the trial court for proceedings consistent with this opinion.

## I. Background

This dispute stems from a legal malpractice claim filed by N.W.M., through her parents, J.M. and N.M., against her former GAL, Patrice Langenbach, Esquire, and Attorney Langenbach's employer, Defender Association of Philadelphia.[3, 4] Attorney Langenbach represented N.W.M. in a dependency matter pursuant to the Juvenile Act,[5] and, later, in a corresponding termination of parental rights matter pursuant to the Adoption Act.[6]

---

[3] For ease of reference herein, we refer to N.W.M. and her minor sibling E.M. collectively as "Children"; Children's parents, J.M. and N.M., individually as "Mother" and "Father" and collectively as "Parents"; Children's paternal grandmother, J.A.M., as "Grandmother"; and Defender Association of Philadelphia as "Defender Association." At times, we refer to Attorney Langenbach and Defender Association collectively as "Appellants."

[4] N.W.M.'s legal malpractice claim was part of a lawsuit filed by Parents on Children's behalf. Each child asserted legal malpractice claims against Attorney Langenbach and Defender Association, as well as an intentional infliction of emotion distress ("IIED") claim against Attorney Langenbach. Grandmother asserted her own IIED claim against Attorney Langenbach. As we discuss in more detail *infra*, the trial court dismissed all claims on grounds of immunity. The trial court also dismissed all claims except N.W.M.'s legal malpractice claim based upon the alternate grounds of failure to state a claim upon which relief could be granted. For ease of discussion, we focus upon N.W.M.'s legal malpractice claim, because it is the only claim that was dismissed solely due to the disputed issue.

[5] 42 Pa.C.S. §§ 6301-6375.

[6] 23 Pa.C.S. §§ 2101-2938.

When N.W.M. was seven weeks old, Children's Hospital of Philadelphia ("CHOP") discovered that she had sustained several rib fractures. Parents denied harming N.W.M. and denied knowledge of how N.W.M. was injured. They theorized that a variant in N.W.M.'s genes caused the fractures, or that N.W.M.'s two-year-old brother, E.M., inflicted the injuries during rough play. However, a CHOP physician opined that the fractures were caused by non-accidental trauma inflicted by an adult. The Philadelphia Department of Human Services ("DHS") obtained and executed an emergency court order removing N.W.M. from Parents' custody.

The juvenile court appointed Defender Association to represent N.W.M. as GAL, and Defender Association assigned Attorney Langenbach to the case.[7] After hearing testimony from a DHS social worker, the CHOP physician, and Mother, the juvenile court adjudicated N.W.M. dependent pursuant to the Juvenile Act[8] and made a finding of child abuse pursuant to the Child Protective Services Law ("CPSL").[9] The juvenile court

---

[7] N.W.M.'s legal malpractice complaint did not specify the statute governing Attorney Langenbach's appointment and referred to her generically as a "Child Advocate." Complaint ¶ 23. The trial court in the malpractice matter determined that the juvenile court appointed Attorney Langenbach as a GAL pursuant to the Juvenile Act and the Juvenile Court Rules of Procedure. Tr. Ct. Op., 10/5/2020, at 3 n.2 (citing 42 Pa.C.S. § 6311 and Pa.R.J.C.P. 1151). We discuss the nature of Attorney Langenbach's appointment in more detail *infra*.

[8] *See* 42 Pa.C.S. § 6302 (defining, in relevant part, a "dependent child" as one who is "without proper parental care or control, subsistence, education as required by law, or other care or control necessary for his physical, mental, or emotional health, or morals"); *id.* § 6341 (governing adjudication of a dependent child).

[9] *See* 23 Pa.C.S. § 6303 (defining, in relevant part, that a "founded report" of child abuse includes an adjudication of dependency under the Juvenile Act accompanied by a judicial finding of child abuse).

declined to place N.W.M. with Grandmother, as requested by Parents, and ordered DHS to place N.W.M. in non-kinship foster care.[10]

The juvenile court adjudicated E.M. dependent as well, but the siblings' dependency cases followed different paths. After E.M. was removed from Parents' care, he was placed into kinship care with Grandmother. At the adjudication hearing, the juvenile court returned E.M. to Parents' care under DHS supervision. The juvenile court discharged E.M.'s dependency case entirely at the first permanency hearing,[11] finding that Parents had the protective capacity to care for E.M.

Despite the ultimate finding that E.M. was safe in Parents' care, and that Grandmother was an appropriate kinship caregiver for E.M. in the meantime, the juvenile court repeatedly refused to return N.W.M. to Parents or to place her with Grandmother. At a permanency hearing six months after the adjudication hearing, the juvenile court proclaimed that, considering the CHOP physician's testimony at the adjudication hearing, the court was unwilling to consider reunification without an admission of abuse by Parents or a plausible explanation as to how N.W.M. was injured. The juvenile court also informed the parties that it was "not going to consider kinship care," stating, "if I leave her in foster care maybe I get closer to an answer as to what happened instead of moving her to grandmom."[12] These rulings prompted Parents to file several appeals in the Superior Court.

---

[10] *See* 42 Pa.C.S. § 6351(a) (granting the juvenile court authority to enter "orders of disposition best suited to the safety, protection and physical, mental, and moral welfare" of a dependent child).

[11] *See id.* § 6351(e) (requiring the juvenile court to conduct regular permanency hearings).

[12] *See In re N.M.*, 186 A.3d 998, 1002 (Pa. Super. 2018) (quoting portions of juvenile court's statements on the record at 12/18/2016 permanency hearing) (cleaned up).

While those appeals were pending, DHS filed a petition to terminate Parents' parental rights pursuant to the Adoption Act.[13] Attorney Langenbach continued to represent N.W.M.'s best interests as GAL in the termination matter.[14] The juvenile court conducted a hearing and granted DHS's petition to terminate Parents' rights to N.W.M. Parents appealed, and the dependency and termination appeals were consolidated.

The Superior Court held that the juvenile court abused its discretion by refusing to place N.W.M. in kinship care with Grandmother and by keeping N.W.M. in foster care as a means to pressure Parents into a confession of child abuse.[15] The Superior Court reversed the permanency review order that prohibited N.W.M.'s placement with Grandmother, vacated the dependency order changing N.W.M.'s permanency goal to adoption, and vacated the termination of parental rights orders. The Superior Court expressed significant concerns regarding the trial judge's conduct in N.W.M.'s dependency case and "strongly suggested" that the trial judge recuse herself on remand.[16]

---

[13] *See* 23 Pa.C.S. § 2511 (setting forth the grounds for terminating parental rights).

[14] The juvenile court also appointed Cureley Cole, Esquire, to represent N.W.M. in the termination matter. Although not entirely clear, the juvenile court presumably appointed Attorney Cole to serve as separate counsel representing N.W.M.'s legal interests in the termination matter. *See* 23 Pa.C.S. § 2313(a) (requiring appointment of counsel to represent a child in a contested termination of parental rights hearing). N.W.M. did not join Attorney Cole in the malpractice lawsuit.

[15] *See In re N.M.*, 186 A.3d at 1011-14.

[16] *Id.* at 1014 n.31. From the Superior Court's perspective, the record was "replete with attempts by Parents to meet the goals set by the trial judge," but the trial judge continually erected "barriers to reunification," thereby paving the way for the legal case to terminate Parents' rights. *Id.* at 1014 n.30. The Superior Court opined that the trial judge appeared to maintain a "fixed presumptive idea of what took place" and refused to admit evidence that "might have forced her to change her opinion." *Id.* The Superior Court maintained that the record provided "example after example" of the trial judge's overreach, failure to be "fair and impartial," and denial of due process to Parents. *Id.*

(continued…)

The trial judge abided by the Superior Court's recusal suggestion, and a new judge was assigned. After reviewing transcripts from the dependency and termination matters, the new trial judge issued an order vacating Attorney Langenbach's appointment as GAL. The juvenile court found that Attorney Langenbach failed to act in N.W.M.'s best interest by

> standing silently and failing to object or challenge the trial court while it denied N.W.M. her right to be placed with her grandmother in violation of the CPSL[17] and while the trial court advanced its plan to judicially coerce a confession from the Parents as to the cause of N.W.M.'s injury. This mute acquiescence requires a new GAL be appointed for N.W.M.[18]

The same day that it issued that order, the juvenile court placed N.W.M. into kinship care with Grandmother. Not long after, the juvenile court returned N.W.M. to Parents and closed the dependency case.

N.W.M. then filed the legal malpractice complaint at issue in this appeal. In her complaint, N.W.M. alleged that Attorney Langenbach acted negligently throughout her representation of N.W.M. as GAL. N.W.M.'s complaint is peppered with Attorney

---

Ultimately, due to the trial judge's conduct in N.W.M.'s case and in other family court cases, the Court of Judicial Discipline sanctioned the trial judge. *See In re Lyris F. Younge*, No. 2 J.D. 19, 6/2/2021. With respect to N.W.M.'s case, the Court of Judicial Discipline found that the trial judge had entered "partial and unfair rulings" dating back to the adjudication hearing. *See In re Lyris F. Younge*, No. 2 JD 19, 12/1/2020 Op. and Order, at 114.

[17]   The juvenile court in N.W.M.'s dependency case, the Superior Court, and N.W.M. refer to the CPSL as the source of the legal requirement to place dependent children with family when possible. The CPSL contains no such mandate. *See* 23 Pa.C.S. § 6302 (CPSL provision setting forth a goal to maintain the family life when appropriate or to provide an alternative permanent family when the unity of the family cannot be maintained); *id.* § 6373(a)(4) (CPSL provision requiring agencies to provide a temporary, substitute placement in foster care or group congregate care). The directive to consider family is found in the Public Welfare Code and the Children in Foster Care Act. *See* 67 Pa.C.S. § 7507(c) (requiring the county agency to give "first consideration to placement with relatives or kin"); 11 P.S. § 2633(18) (requiring children in foster care to be provided with "[f]irst consideration for placement with relatives, including siblings").

[18]   Compl., Ex. B (Juvenile Ct. Order, 5/24/2018, at 3) (cleaned up).

Langenbach's alleged transgressions in the court proceedings and outside of court. Most of the allegations concern Attorney Langenbach's alleged efforts to advocate for N.W.M.'s continued placement in foster care and adoption by her foster parents while failing to support N.W.M.'s reunification with Parents or placement into kinship care with Grandmother.

For example, N.W.M. alleges that Attorney Langenbach's representation of N.W.M. fell below the standard of care because she:

- did not challenge the CHOP physician's credentials or testimony;

- challenged Parents' credibility and asserted inconsistent arguments;

- disparaged Parents to service providers outside of court;

- interfered with Parents' bond with N.W.M. by dismissing N.W.M.'s need for breast milk, supporting N.W.M.'s absence from Parents during significant early events in her life, and preventing Parents from providing her with a Halloween costume;

- objected to Parents' efforts to introduce contrary medical evidence concerning the cause of N.W.M.'s injuries;

- colluded with the solicitor representing DHS to remove service providers who provided positive reports concerning Parents;

- manufactured safety concerns about Grandmother;

- objected to Parents' motion seeking the original trial judge's recusal from presiding over the petition to terminate their parental rights;

- supported the agency's efforts to terminate Parents' parental rights, including objecting (or joining the agency's objections) thirty-seven times in the termination of parental rights hearing;

- objected to Grandmother's presence at the dependency hearing following the Superior Court's remand, opposed N.W.M.'s immediate placement into kinship

care, referred to Parents and Grandmother as strangers, and questioned Parents' ability to keep N.W.M. safe even though they had been parenting E.M. without issue.[19]

N.W.M. alleged that Defender Association was vicariously liable as Attorney Langenbach's employer. N.W.M. alluded as well to Defender Association's alleged negligent supervision of Attorney Langenbach and its failure to terminate her employment.[20]

Attorney Langenbach and Defender Association filed preliminary objections asserting that they were immune from suit under the doctrine of judicial or quasi-judicial immunity.[21] The trial court sustained the preliminary objections and dismissed all claims,

---

[19]    *See* Compl. ¶¶ 23-25, 27-28, 30-32, 36-39, 48-49, 51-52, 54, 58-63, 66-67, 73, 75, 77-79, 83, 87-88, 90, 96, 100-01, 105, 107, 112, 123, 125-26, 130, 133-34, 136-39, 141, 143-44, 157-58, 160-69, 179-83.

[20]    *See id.* ¶¶ 184-94.

[21]    The Rules of Civil Procedure require parties to raise all affirmative defenses, including immunity from suit, in a new matter. Pa.R.Civ.P. 1030(a). It is procedurally improper to raise the defense of immunity in preliminary objections. *Kyle v. McNamara & Criste*, 487 A.2d 814, 816 (Pa. 1985).

N.W.M. objected to this improper procedure, but she did so within a response to the preliminary objections. *See generally* N.W.M.'s Response to Attorney Langenbach's and Defender Association's Preliminary Objection. She should have filed a preliminary objection to the defective preliminary objection. *See Duquesne Slag Prods. Co. v. Lench*, 415 A.2d 53, 54 (Pa. 1980) (holding that a plaintiff must object to an affirmative defense raised in an improper manner *via* preliminary objection or the plaintiff waives the objection).

Following N.W.M.'s response to the preliminary objections, the trial court issued an order sustaining the preliminary objections and dismissing the complaint based upon the doctrine of quasi-judicial immunity, and the Superior Court reversed the trial court's order. None of the parties raised these procedural mishaps before the Superior Court or this Court. We "do not condone the disregard of the Pennsylvania Rules of Civil Procedure," but in light of the parties' abandonment of procedural objections, we will address the issue of immunity on the merits. *Freach v. Commonwealth*, 370 A.2d 1163, 1166 n.6 (Pa. 1977).

ruling that Attorney Langenbach and Defender Association were immune from suit under the doctrine of quasi-judicial immunity.[22]

Based upon Attorney Langenbach's statutory duties as N.W.M.'s GAL, the trial court decided that, functionally, Attorney Langenbach served as an assistant to the juvenile court in adjudicating N.W.M.'s dependency matter. The trial court interpreted Attorney Langenbach's statutory duties as executing "various fact-finding tasks," which in turn enabled her to make recommendations regarding N.W.M.'s best interests to the juvenile court.[23] From the trial court's perspective, this assistance made Attorney Langenbach an "arm of the court," akin to child custody conference officers who enjoy quasi-judicial immunity.[24] The trial court recognized, however, that Attorney Langenbach represented N.W.M. in a dual role by statutory design. In addition to Attorney Langenbach's representation of N.W.M.'s best interests, the Juvenile Act required her to act as an advocate representing N.W.M.'s legal interests.[25]

The trial court opined that it faced the question of whether immunity applied to an attorney in a "hybrid role of advocate and arm of the court," an issue that it judged to be one of first impression in this Commonwealth.[26] The trial court was persuaded by *Carrubba v. Moskowitz*, in which the Supreme Court of Connecticut granted immunity to

---

[22] Alternatively, Attorney Langenbach and Defender Association demurred to all claims. As an alternative ruling on the issue of immunity, the trial court sustained the preliminary objections in part, finding that Children and Grandmother failed to state an IIED claim and that E.M. failed to state a claim for legal malpractice. The court overruled the demurrer as to N.W.M.'s legal malpractice claims, leaving this claim viable if the trial court's decision regarding immunity was reversed on appeal.

[23] Tr. Ct. Op., 10/5/2020, at 8-9 (citing 42 Pa.C.S. § 6311(b)(7), (9)).

[24] *Id.* at 10 (citing *Logan v. Lillie*, 728 A.2d 995, 998 (Pa. Cmwlth. 1999)).

[25] *Id.* at 9 (citing 42 Pa.C.S. § 6311(a)).

[26] *Id.* at 10.

a child custody attorney who operated in a hybrid role. The Connecticut court had found it difficult to disentangle the attorney's advocate function from the attorney's best interest function and had determined that the attorney's primary duty was assisting the court in serving the best interests of the child.[27]

Guided by *Carrubba*, the trial court decided here that, because a GAL's role under the Juvenile Act is to represent what the GAL believes "is best for the child's care, protection, safety, and wholesome physical and mental development," and because one of the "primary purposes of dependency proceedings is to 'provide for the care, protection, safety and wholesome mental and physical development of children,'" a GAL's "role as an advocate must therefore be subordinated to the role of assisting the court in its goal of protecting the best interests of the child."[28]

The trial court also ventured policy-based reasons in support of its decision to confer quasi-judicial immunity.[29] The trial court perceived an inconsistency between the immunity afforded to judges who appoint and rely upon GALs' recommendations, while the GALs themselves are exposed to liability. Moreover, the trial court expressed concerns as to GALs' risk exposure because they make recommendations to the juvenile court as to whether children enjoy proper parental care. The trial court deemed it important to afford GALs independence so that they are not compelled to answer for mistakes honestly made and so that they are not swayed by the prospect of future malpractice suits.

---

[27]     *See id.* at 10-12 (discussing *Carrubba v. Moskowitz*, 877 A.2d 773 (Conn. 1995)).

[28]     *Id.* at 12 (quoting Pa.R.J.C.P. 1154, cmt.; 42 Pa.C.S. § 6301(b); Pa.R.J.C.P. 1101).

[29]     *See id.* at 12-13.

The trial court concluded that, based upon their statutory duty to assist the court in determining the children's best interests, GALs perform a quasi-judicial adjudicatory function in dependency matters that entitles them to quasi-judicial immunity.[30] Reviewing the civil complaint, the court determined that all allegations involved conduct within the scope of Attorney Langenbach's performance of her duties as GAL.[31] As such, Attorney Langenbach was immune from suit. As her employer, Defender Association also was immune.[32]

Upon appeal by N.W.M., the Superior Court reversed, albeit in a divided opinion.[33] Based upon its recent opinion in *Z.F.1 v. Bethanna*,[34] the Superior Court held that the trial court erred in ruling that Attorney Langenbach and Defender Association were immune from suit.[35] Applying *Z.F.1*, the Superior Court "again decline[d] the invitation to create immunity for GALs where no such immunity exists in statute, rule, or case law."[36]

In *Z.F.1*, two minors, through their father, sued Defender Association for legal malpractice associated with Defender Association's GAL representation during the minors' juvenile proceedings. The malpractice complaint alleged that Defender Association breached its duty of care to the children by failing to investigate their father's

---

[30] *Id.* at 13.

[31] *Id.* at 14.

[32] *Id.*

[33] Each of the three judges on the panel would have affirmed the trial court's alternative holding that Children and Grandmother failed to state claims for intentional infliction of emotional distress and that E.M. failed to state a claim for legal malpractice. The judges could not reach consensus on the trial court's immunity ruling.

[34] *Z.F.1 v. Bethanna*, 244 A.3d 482 (Pa. Super. 2020).

[35] *N.W.M. v. Langenbach*, 1532 EDA 2020, 2022 WL 290908, at *4 (Pa. Super. Feb. 1, 2022) (non-precedential decision).

[36] *Id.*

concerns that they were being sexually abused in foster care.[37]  A trial jury returned a verdict of over two million dollars for each child.  The jury attributed fifty-five percent of the liability to Defender Association's legal malpractice and apportioned the remaining liability to the foster care agency and the foster parents.  The Superior Court affirmed the judgment, rejecting Defender Association's claim that it was entitled to "judicial and/or quasi-judicial immunity."[38]  The Superior Court opined that Defender Association was seeking an unprecedented type of immunity, one which the Superior Court refused to build on a foundation of extra-jurisdictional cases and policy arguments.  As an error-correcting court, the intermediate panel maintained that it was not its "institutional role" to "make such policy decisions" or to expand existing legal doctrines.[39]  Judgments of that nature, the *Z.F.1* Court concluded, were for this Court or the General Assembly.

In a concurring and dissenting memorandum in the case before us today, Judge Daniel Pellegrini took a different approach.  While he did not address *Z.F.1* specifically, Judge Pellegrini disagreed with the majority's refusal to decide whether Attorney Langenbach and Defender Association were immune from suit.[40]  "[W]hile we may be an error-correcting court," Judge Pellegrini opined, "we are not a potted plant."[41]  In his view, when the litigants raise issues central to an appeal's resolution, including the question of whether a principle applied in other cases should be applied or extended to a subsequent case, it is the Superior Court's duty to decide the matter, even if this Court has not

---

[37]     *See Z.F.1*, 244 A.3d at 494.

[38]     *Id.*

[39]     *Id.* (citing *Matter of M.P.*, 204 A.3d 976, 986 (Pa. Super. 2019)).

[40]     *N.W.M.*, 2022 WL 290908, at *8 (Pellegrini, J., concurring and dissenting).

[41]     *Id.* (Pellegrini, J., concurring and dissenting).

squarely addressed the issue.[42] If necessary, Judge Pellegrini reasoned, we will accept review and weigh the merits of the Superior Court's rationale and decision.[43]

Turning to the merits of this case, Judge Pellegrini noted that "*ad litem*" means "for the purposes of the legal action only," suggesting that a GAL "is appointed to perform a very specific task in a very specific context."[44] Unlike a guardian of the person or an attorney appointed to represent a child, he opined, a dependency GAL lacks the "authority to act for the child" and does not conduct "other tasks outside the context of the proceeding."[45]

From Judge Pellegrini's perspective, a GAL in a dependency matter is tasked with aiding "the court in making a decision."[46] The GAL does this by making his or her own decisions about the best interests of the child and then reporting his or her conclusions to the trial court. The trial court, however, makes the "ultimate determination as to what is in the best interests of the child."[47] Thus, Judge Pellegrini opined, it was the juvenile court judge who was responsible for determining the best interests of the children and who was the direct cause of the purported harms for which N.W.M. was seeking damages

---

[42] *See id.* at *9 (Pellegrini, J., concurring and dissenting) (citing cases where the Superior Court or Commonwealth Court determined in the first instance that immunity applied to certain officials performing judicial or quasi-judicial functions).

[43] *See id.* at *9 (Pellegrini, J., concurring and dissenting) (citing *Durham v. McElynn*, 772 A.2d 68, 70 (Pa. 2001) (affirming the Superior Court's decision to extend public official immunity to assistant district attorneys)).

[44] *Id.* at *8 (Pellegrini, J., concurring and dissenting) (quoting *Ad Litem*, BLACK'S LAW DICTIONARY (6th ed. 1990)).

[45] *Id.* (Pellegrini, J., concurring and dissenting).

[46] *Id.* (Pellegrini, J., concurring and dissenting).

[47] *Id.* (Pellegrini, J., concurring and dissenting).

from Attorney Langenbach and Defender Association.[48] Judge Pellegrini would affirm the trial court's principal holding—that Attorney Langenbach and Defender Association were immune from suit under the doctrine of judicial immunity—and would do so for the reasons stated by the trial court.

Judge Megan King joined the majority only as to the disposition of the appeal. In a concurring memorandum, Judge King opined that the Superior Court was bound by *Z.F.1*. Judge King agreed with Judge Pellegrini, however, that it was within the Superior Court's "purview" to decide whether GALs should be immune from suit.[49]

Judge Maria McLaughlin, the majority author, maintained that the Superior Court lacked authority to make new law based upon competing policy-based interests, and asserted that the immunity cases cited in the concurring and dissenting memorandum were merely circumstances in which the intermediate appellate courts applied existing doctrines to new facts.[50] In contrast, Judge McLaughlin concluded that here, Attorney Langenbach and Defender Association sought to develop a new doctrine that intermixed aspects of judicial and quasi-judicial immunity.[51] To credit their contention that immunizing GALs would empower them to perform their duties without influence, fear, or intimidation, the Superior Court would have to balance competing interests and choose what it deemed to be the best path. In Judge McLaughlin's view, resolving such a question was a matter of policy and beyond the Superior Court's "ken."[52]

---

[48] *Id.* (Pellegrini, J., concurring and dissenting).

[49] *Id.* at *7-8 (King, J., concurring).

[50] *Id.* at *4.

[51] *Id.*

[52] *Id.*

Attorney Langenbach and Defender Association petitioned this Court for allowance of appeal, which we granted.[53]  We are tasked here with deciding whether the Superior Court erred by concluding that Pennsylvania's intermediate appellate courts lack the authority to decide legal issues of first impression.[54]  Second, we must decide, as an issue of first impression, whether GALs are entitled to quasi-judicial immunity.  These issues present questions of law, for which our standard of review is *de novo* and our scope of review plenary.[55]

## II.    Parties' Arguments

### A.    Superior Court's Authority to Decide Novel Issues

Attorney Langenbach and Defender Association ask this Court to overrule *Z.F.1*. They contend that the Superior Court's holding—that its "institutional role" is to correct errors, not to make "policy" decisions—was based upon a faulty premise.[56]  They assert that *M.P.*, the Superior Court case upon which the *Z.F.1* Court relied for this proposition, merely supports the principle that the Superior Court must apply the decisional law rendered by this Court, even if it disagrees with the outcome.  *M.P.*, and the authority upon which it relies, Attorney Langenbach and Defender Association claim, do not suggest that the Superior Court lacks the authority to address novel issues of law.[57]

While the Superior Court's primary role is to apply the decisional law of this Court, Attorney Langenbach and Defender Association argue, this is not its sole function.  The Superior Court serves also to "stimulate revision in the law by the highest court where

---

[53]    *N.W.M. v. Langenbach*, 67 EAL 2022, 283 A.3d 791 (Pa. 2022) (table).

[54]    We have re-ordered the issues for ease of disposition.

[55]    *In re Koepfinger*, 302 A.3d 630, 639 (Pa. 2023).

[56]    Appellants' Br. at 41 (citing *Z.F.1*, 244 A.3d at 494).

[57]    *See id.* at 41-45 (discussing *M.P.*, 204 A.3d at 986, and cases cited by *M.P.*).

reform or clarification is necessary" and to serve as a "laboratory" for this Court by sharpening the issues and suggesting possible solutions.[58]  According to Attorney Langenbach and Defender Association, the Superior Court regularly decides issues of first impression.  In fact, the intermediate level courts were the first to establish much of the law regarding quasi-judicial immunity.[59]  *Z.F.1*'s refusal to consider policy arguments is counterproductive, Appellants maintain, because it deprives this Court of analysis to consider.  Litigants must either proceed through courts that cannot afford them relief or directly petition this Court, which hears cases on a limited and discretionary basis.  As such, Attorney Langenbach and Defender Association contend, *Z.F.1* threatens the operation of our common law system.[60]

N.W.M., on the other hand, argues that the Superior Court correctly decided *Z.F.1* and appropriately applied that precedent to the instant case.[61]

### B. Immunity

Attorney Langenbach and Defender Association urge this Court to extend the doctrine of quasi-judicial immunity to GALs.[62]  This doctrine, they explain, stems from the

---

[58]     *Id.* at 45-46 (quoting *Commonwealth v. Montini*, 712 A.2d 761, 769 (Pa. Super. 1998) (Johnson, J., concurring) and *Hatchard v. Westinghouse Broad. Co.*, 504 A.2d 211, 222-23 (Pa. Super. 1986), *rev'd on other grounds*, 532 A.2d 349 (Pa. 1987)).

[59]     *See id.* at 31, 47-48.

[60]     *See id.* at 49.

[61]     *See* N.W.M.'s Br. at 56.

[62]     A joint *amici curiae* brief supporting Appellants' position was submitted by KidsVoice, Montgomery Child Advocacy Project, Support Center for Child Advocates, Montgomery County Child Advocacy Unit, and Bucks County Guardian *ad Litem* Office (five organizations that employs staff attorneys or that affiliate with volunteer attorneys to represent dependent children in juvenile court in the counties of Allegheny, Bucks, Montgomery, and Philadelphia).  Thirty individual attorneys who represent children as GALs in dependency cases in other counties across the Commonwealth also signed the brief as *amici*.

common law principle that judges require absolute immunity if they are to perform their duties with independence.[63] Appellants maintain that the public has an interest in ensuring that individuals who operate as an arm of the court are similarly free to perform their duties without fear of reprisal or interference.[64] Attorney Langenbach and Defender Association contend that such individuals include assistant district attorneys,[65] judicial law clerks,[66] workers' compensation referees,[67] zoning board members,[68] and child custody conference officers.[69]

Attorney Langenbach and Defender Association argue that the duties of GALs, as delineated in the Juvenile Act, demonstrate that persons so appointed function as arms of the court. In fact, Appellants posit, GALs are "integral to the functioning of juvenile courts."[70] Like judicial law clerks or custody conference officers, GALs do not render decisions, but they assist judges by ascertaining the facts.[71] Specifically, the Juvenile Act directs GALs to collect information, present evidence and witnesses, and make recommendations to the court regarding the appropriateness and safety of the child's

---

[63] Appellants' Br. at 28.

[64] *Id.* at 30-31.

[65] *Id.* (citing *Durhman v. McElynn*, 772 A.2d 68 (Pa. 2001)). Notably, the *Durhman* Court applied the doctrine of public official immunity, not quasi-judicial immunity. Prosecutors are immune because the public would "suffer if the prosecution of criminals were impeded" by "civil suits claiming damages for actions taken in [prosecutors'] official capacities." *See Durhman*, 772 A.2d at 70.

[66] *Id.* at 31 (citing *Feingold v. Hill*, 521 A.2d 33, 36 (Pa. Super. 1987)).

[67] *Id.* (citing *Myers v. Com. Dep't of Lab. & Indus.*, 458 A.2d 235 (Pa. Super. 1983)).

[68] *Id.* (citing *Urbano v. Menses*, 431 A.2d 308 (Pa. Super. 1981)).

[69] *Id.* (citing *Logan*, 728 A.2d at 998).

[70] *Id.* at 37.

[71] *See id.* at 32-34 (citing 42 Pa.C.S. § 6311(b)(4) and Pa.R.J.C.P. 1154(4)).

placement and any services necessary to address the child's needs and safety.[72]  They advise the court of the child's wishes and present whatever evidence exists to support those wishes.[73]  Attorney Langenbach and Defender Association assert that GALs serve at the pleasure of the court and are subject to replacement in the same manner as law clerks and custody conference officers.[74]

According to Attorney Langenbach and Defender Association, every federal and state court that has considered the issue has extended quasi-judicial immunity to GALs, and this Court should do the same.[75]  They argue that important policy interests, including the protection of children and the need for a judiciary free from influence or intimidation, require extension of quasi-judicial immunity to GALs.[76]  They contend that GALs are entrusted by the public, the General Assembly, and the courts to conduct investigations into the well-being of dependent children and to offer recommendations in service of those children's best interests.  GALs are at risk of suffering "vindictive conduct by angry or emotionally frustrated parents and others."[77]  If GALs fear reprisal or civil liability for performing their statutory duties, Attorney Langenbach and Defender Association warn, they may cease making recommendations that truly reflect their independent judgment. Without a GAL, Attorney Langenbach and Defender Association argue, the juvenile court has no practical or effective means to ensure that it has all pertinent information,

---

[72]     *See id.* at 34 (citing 42 Pa.C.S. § 6311(b)(7)).

[73]     *See id.* (citing 42 Pa.C.S. § 6311(b)(9)).

[74]     *Id.* at 34-35.

[75]     *Id.* at 35-37, Appx. E. (collecting cases immunizing GALs appointed to represent a minor's interests in a variety of contexts, such as in legal settlements, in civil litigation, in litigation to determine paternity, in child support actions, and in custody actions between two parents).

[76]     *See id.* at 37-40.

[77]     *Id.* at 38.

particularly information untainted by adversarial interests. Appellants warn that the number of reliable, experienced professionals serving as GALs will decline as more cases are filed against them.[78]

Attorney Langenbach and Defender Association further argue that "every participant in dependency proceedings, except the GAL—the judge, the county child welfare agency, the prosecuting attorneys, and the mandatory reporters of child abuse— is protected from liability by some form of immunity."[79] Appellants urge this Court to protect GALs as well. Otherwise, they posit, each time a GAL takes a position adverse to a child's family, disgruntled relatives, ostensibly on behalf of a minor child, may sue the GAL for performing tasks that the General Assembly required the GAL to perform.

N.W.M. responds by observing that a central objective of negligence law is holding individuals, including lawyers, liable for their misconduct.[80, 81] N.W.M. contends that Pennsylvania law disfavors status-based immunity for negligence, pointing out that this Court abolished several judicially-created categories of immunity over fifty years ago.[82] The default rule is liability, N.W.M. maintains, with narrow exceptions for judicial immunity and grants of immunity adopted by the General Assembly through statute.

---

[78] *Id.* at 40.

[79] Appellants' Reply Br. at 12 (cleaned up); *see also* Appellants' Br. at 15 n.3 ("[N.W.M. sued the GAL alone, recognizing that every other entity and individual involved in the dependency proceeding . . . were all protected from suit by immunity.").

    Appellants' assertion is overbroad in two respects. The listed actors are afforded immunity in *some* circumstances from *certain* claims. Furthermore, notably absent from Appellants' list is any mention of attorneys who are court-appointed to represent parents, colloquially known as parent advocates.

[80] *See* N.W.M.'s Br. at 17-19.

[81] Pennsylvania Association for Justice submitted an *amicus* brief on behalf of N.W.M.

[82] *See* N.W.M.'s Br. at 18-19 (citing *Scampone*, 57 A.3d at 598-97).

N.W.M. insists that Attorney Langenbach's conduct was pure advocacy, and was not judicial in nature.[83] Attorney Langenbach called and cross-examined witnesses. She declined to challenge DHS's expert witness's conclusions about abuse. She challenged the credibility of Parents and Grandmother. She made oral argument. She advocated for specific legal outcomes. She made, joined, and responded to motions. She made evidentiary objections. Attorney Langenbach's representation of N.W.M. fell below the standard of care for a dependency GAL, N.W.M. argues, because Attorney Langenbach opposed kinship care with a qualified and willing relative, advocated against reunification despite Parents' completion of all court-ordered requirements, and failed to act to preserve the family unit and N.W.M.'s family bonds.[84]

These actions, N.W.M. argues, are not functions "normally performed by a judge."[85] They differ in kind from the functions performed by those individuals who enjoy quasi-judicial immunity. Attorney Langenbach did not act under the supervision of a judge like the law clerk in *Feingold* and the custody conference officer in *Logan*.[86] The juvenile court did not task her with communicating directly with the court about her findings or recommendations. Attorney Langenbach's function was to advocate for N.W.M.'s interests, N.M.W. insists, not to act as a public servant representing the interests of society as a whole. Like non-immune court-appointed public defenders in criminal cases, Attorney Langenbach discharged no duty to the public, except in the broad sense of

---

[83]    *See id.* at 31-34.

[84]    *See id.* at 33-34.

[85]    *Id.* at 34 (quoting *Petition of Dwyer*, 406 A.2d 1355, 1361 (Pa. 1979)).

[86]    *See id.* at 34-35 (citing *Feingold*, 521 A.2d at 37 and *Logan*, 728 A.2d at 998).

representing indigent clients.[87]  As would be the case for any paying client, Attorney Langenbach owed a duty to her client, here N.W.M.

Moreover, N.W.M. argues, Defender Association is not an arm of the judiciary; it is a private law firm that holds a valuable multi-million-dollar contract with the City of Philadelphia to represent indigent clients and children in dependency court.  Defender Association's website describes the duties of lawyers working in the child advocate unit, all of which are consistent with attorney obligations in juvenile dependency court proceedings.[88] Langenbach's appointment as GAL, N.W.M. argues, was for the purpose of "aiding and protecting" N.W.M.[89]  She was not "team judge," she was "team N.W.M."[90]

N.W.M. further notes that this Court has held that the "goodness" of one's work provide no basis for categorical immunity.[91]  N.W.M. contends that liability exposure for GALs can serve the interests of children.  Not only does the tort system assure payment that helps make people whole for tortious conduct that victimizes them, but it also warns all that justice demands the exercise of care.[92]  N.W.M. insists that the threat that GALs will stop representing children without immunity is overblown, considering that Defender

---

[87]     *Id.* at 35 (citing *Ferri v. Ackerman*, 444 U.S. 193, 202-04 (1979)).

[88]     *See id.* at 37 (citing "*Child Advocacy Unit*," Defender Association of Philadelphia, https://phillydefenders.org/practice-units/child-advocacy/#dignity)).     Significantly, as discussed *infra*, N.W.M. misidentifies the legal source of GALs' obligations as 23 Pa.C.S. § 5334 and Pa.R.Civ.P. 1915.11-2.  These provisions apply only to GALs appointed in proceedings under the Child Custody Act, 23 Pa.C.S. §§ 5321-5340.

[89]     *Id.* at 40.

[90]     *Id.* at 42.

[91]     *Id.* at 44 (citing *Flagiello v. Pa. Hosp.*, 208 A.2d 193, 201 (Pa. 1965) (abolishing charitable immunity for hospitals)).

[92]     *See id.* at 44-45.

Association has been representing children for over fifty years without any such guarantee.

## III.    Analysis

### A.    Superior Court's Authority to Decide Novel Issues

We need not dwell long upon this issue. We agree with Attorney Langenbach and Defender Association that the Superior Court's rationale for declining to rule upon a legal issue of first impression involving "policy" considerations lacks support under Pennsylvania law. Article 5, Section 3 of the Pennsylvania Constitution does not limit the Superior Court in any such fashion.[93] Nor does Section 742 of the Judicial Code, which affords the Superior Court "exclusive appellate jurisdiction of all appeals from final orders of the courts of common pleas, regardless of the nature of the controversy or the amount involved" except matters that are in the exclusive jurisdiction of the Supreme Court or the Commonwealth Court.[94] Section 542 of the Judicial Code provides that the "Superior Court shall have all powers necessary or appropriate in aid of its jurisdiction which are agreeable to the usages and principles of law."[95]

*Z.F.1*'s declination to decide a legal issue of first impression was premised upon the Superior Court's earlier decision in *M.P.* But *M.P.* merely reiterated the unremarkable concept that the Superior Court is bound to follow existing law announced by this Court. If this Supreme Court has decided an issue, the Superior Court must apply our precedent

---

[93]     *See* PA. CONST. art. V § 3 ("The Superior Court shall be a statewide court, and shall . . . have such jurisdiction as shall be provided by this Constitution or by the General Assembly.").

[94]     42 Pa.C.S. § 742.

[95]     *Id.* § 542.

faithfully, irrespective of whether or not it agrees with the analysis or outcome.[96]  It is true that *M.P.* broadly pronounced that it "is not the prerogative of an intermediate appellate court to enunciate new precepts of law or to expand existing legal doctrines. Such is a province reserved to the Supreme Court."[97]  In context, however, the Superior Court merely was noting that it could not deviate from established Supreme Court caselaw. *M.P.*'s quote stemmed from *Malinder v. Jenkins Elevator & Machine Co.*, in which the Superior Court *en banc* explained that, in cases with substantially similar facts, the Superior Court was bound to follow the analytical framework set forth by this Court.[98] Only in the absence of precedent, the *Malinder* Court noted, may the Superior Court develop its own framework.[99]

The Superior Court's main function is to correct errors and abuses of discretion made by the trial courts.  In doing so, it must "maintain and effectuate the decisional law of this Court as faithfully as possible."[100]  However, all lower courts, by necessity, must sometimes review legal issues that have "no controlling appellate authority."[101]  When

---

[96]     *See Malinder v. Jenkins Elevator & Mach. Co.*, 538 A.2d 509 (Pa. Super. 1988) (*en banc*) ("Where the Supreme Court has spoken on a particular subject, it is our obligation, as an intermediate appellate court, to follow and apply that decision so as to establish some measure of predictability and stability in our case law.  In the absence of a legally relevant distinction between the facts of a previous case and the case before us, we are obliged to follow the dictates of the Supreme Court's decision in the prior case.").

[97]     *M.P.*, 204 A.3d at 986 (quoting *Moses v. T.N.T. Red Star Exp.*, 725 A.2d 792, 801 (Pa. Super. 1999) (citing *Malinder*, 538 A.2d at 513)).

[98]     *See Malinder*, 538 A.2d at 513.

[99]     *Id.*

[100]    *Commonwealth v. Dugger*, 486 A.2d 382, 386 (Pa. 1985).

[101]    *See McLaughlin v. Nahata*, 298 A.3d 384, 405 (Pa. 2023).

that happens, it must strive to follow related guidance from this Court and decide the issue "in a manner faithful to longstanding principles of law."[102]

That a legal issue may involve competing "policy" considerations does not mean that the lower courts are powerless to decide the issue presented. If the legal issue is one within the judicial (and not exclusively legislative) domain, the Superior Court can, and should, use its judgment to decide that issue, rather than refrain on the basis of its error-correcting role. This Court may exercise its discretion to correct the Superior Court when needed.[103] A thoroughly reasoned analysis by the intermediate court assists this Court in crystalizing the legal issues, prevents the law from becoming stagnant, and ensures that the public receives full consideration of the legal issues in dispute. Accordingly, we overrule *Z.F.1* to the extent that the Superior Court held that it was unable to decide legal issues of first impression involving "policy" considerations presented by litigants.

## B. Immunity

### 1. Judicial and Quasi-Judicial Immunity

The principle that judges must be free to perform their judicial function without the specter of liability in a civil action has deep roots in English common law.[104] A key premise of the doctrine of judicial immunity is that it exists not to shield tortfeasors, but rather to protect the public's interest in ensuring that certain individuals in society are able to

---

[102]    *Id.*

[103]    *See, e.g.*, *Weaver v. Harpster*, 975 A.2d 555 (Pa. 2009) (overruling a Superior Court decision holding that the Pennsylvania Human Relations Act and the Equal Rights Amendment provided a public policy exception to the at-will employment doctrine for sex discrimination by an employer not covered by the PHRA); *see also* Pa.R.A.P. 1114(a), (b)(3) (listing an issue of first impression as a "special and important reason" for this Court to exercise its discretion to grant a parties' petition for allowance of appeal).

[104]    *See Bradley v. Fisher*, 80 U.S. 335, 347 (1871).

perform their important functions without apprehension of personal consequences.[105]

The public has an interest in judges exercising their discretion freely and independently without concerns about potential individual liability or the distraction of a lawsuit.[106] Judge Learned Hand, albeit in the context of official immunity, elucidated the principle with his characteristic succinctness and eloquence:

> It does indeed go without saying that an official, who is in fact guilty of using his powers to vent his spleen upon others, or for any other personal motive not connected with the public good, should not escape liability for the injuries he may so cause; and, if it were possible in practice to confine such complaints to the guilty, it would be monstrous to deny recovery. The justification for doing so is that it is impossible to know whether the claim is well founded until the case has been tried, and that to submit all officials, the innocent as well as the guilty, to the burden of a trial and to the inevitable danger of its outcome, would dampen the ardor of all but the most resolute, or the most irresponsible, in the unflinching discharge of their duties.[107]

In *Petition of Dwyer*, this Court, guided by the United States Supreme Court's decision in *Butz v. Economou,*[108] afforded "quasi-judicial immunity" to state agency officials performing adjudicative functions akin to judicial work.[109] This Court noted that, in applying the doctrine, *Butz* focused upon the "presence and exercise of discretionary decision-making authority (*i.e.*, applying the law, rules and regulations to the factual matrix of a given case)" and the "ability to freely exercise [such] discretion without

---

[105]    *See Petition of McNair*, 187 A. 498, 502 (Pa. 1936) (citing *Commonwealth v. Cauffiel*, 79 Pa.Super. 596, 600-01 (1922)).

[106]    Hence, "judicial immunity is not only immunity from damages, but also immunity from suit." *Guarrasi v. Scott*, 25 A.3d 394, 405 n.11 (Pa. Cmwlth. 2011).

[107]    *Gregoire v. Biddle*, 177 F.2d 579, 581 (2d Cir. 1949).

[108]    *Butz v. Economou*, 438 U.S. 478, 513-14 (1978) (holding that federal agency adjudicators are "functionally comparable" to judges and entitled to absolute immunity from damages liability for their judicial acts).

[109]    *Petition of Dwyer*, 406 A.2d at 1359.

harassment or intimidation by disappointed parties."[110]  Like judges, the state adjudicators issued subpoenas, ruled upon evidence, regulated hearings, and made or recommended decisions.  Because the role of these adjudicators was "functionally comparable" to the role of judges, this Court decided that they were entitled to "quasi-judicial immunity" from suit.[111]

The lower courts have applied the doctrine of quasi-judicial immunity to individuals who work within the court system by serving as assistants to judges or performing judicial functions.  In *Feingold v. Hill*, a litigant sued a trial court judge and the judge's law clerk after the judge granted preliminary objections to the litigant's complaint.  The Superior Court reiterated that judges are absolutely immune from liability for damages when performing judicial acts, even if they err in their actions or perform them with malice, provided there is not a clear absence of jurisdiction over the subject matter and person. The Superior Court observed that "law clerks are appointed by judges, within the scope of their constitutional authority, as necessary attendants to the court, to assist judges in the performance of their judicial functions."[112]  Because judges are immune from liability, the Superior Court reasoned, it would be harsh to subject law clerks to liability for "merely performing their appointed tasks."[113]  Due to the relationship between judges and law clerks, the Superior Court concluded that the "cloak of quasi-judicial immunity must be extended to law clerks in the performance of their official duties if we are not to entirely emasculate the independence of the judiciary itself."[114]

---

[110]     *Id.* at 1360 (citing *Butz*, 438 U.S. at 508-12).

[111]     *Id.* at 1359 (quoting *Butz*, 438 U.S. at 513).

[112]     *Feingold*, 521 A.2d at 37.

[113]     *Id.* at 38.

[114]     *Id.*

In *Logan v. Lillie*, a father sued a child custody conference officer, seeking equitable relief and monetary damages.[115]  In response to an emergency custody petition filed by the child's mother, a family court judge had ordered both parents to appear at a custody conference before the child custody conference officer.  At the conference, the conference officer ascertained that the parents could not resolve the petition by mutual agreement.  The conference officer submitted a report and proposed order recommending that the judge suspend the father's visits temporarily, which report the judge adopted and entered.  The Commonwealth Court determined that the conference officer was "acting under her judicial authority" in a "quasi-judicial role" pursuant to Pa.R.Civ.P. 1915.4-2.[116]  Relying upon *Butz*, the Commonwealth Court held that the conference officer was immune from suit because she performed "judicial functions" and acted as an "arm of the court."[117]

2. The Function of a GAL under the Juvenile Act

Central to deciding whether the GAL should be entitled to immunity is understanding the GAL's function as set forth in the Juvenile Act.  Parties to a dependency proceeding, including children alleged or found to be dependent, are entitled to representation by legal counsel at all stages.[118]  If the litigant is without financial resources or otherwise unable to employ counsel, the court must appoint counsel.[119]  In certain types of dependency cases, the Juvenile Act also directs the court to "appoint a guardian

---

[115]  *Logan*, 728 A.2d at 997-98.

[116]  *Id.* at 998-99.

[117]  *Id.* (citing *Butz*, 438 U.S. at 513); *see also Guarrasi*, 25 A.3d at 405 n.11 (finding that a court administrator acting under direction of a common pleas judge had quasi-judicial immunity from constitutional and civil rights claims).

[118]  42 Pa.C.S. §§ 6337-6337.1(a).

[119]  *Id.* § 6337.

*ad litem*," who "must be an attorney at law," "to represent the legal interests and the best interests of the child."[120]  A GAL is required in any proceeding alleging that a child "is without proper parental care or control, subsistence, education as required by law, or other care or control necessary for his physical, mental, or emotional health, or morals."[121]

Unlike a conventional lawyer, who represents only a client's expressed legal wishes, a GAL's obligations are several, and are defined by statute.  The GAL's powers and duties are expressly set forth in the Juvenile Act, as follows:

> (b) Powers and duties.--The guardian *ad litem* shall be charged with representation of the legal interests and the best interests of the child at every stage of the proceedings and shall do all of the following:
>
> (1) Meet with the child as soon as possible following appointment pursuant to section 6337 (relating to right to counsel) and on a regular basis thereafter in a manner appropriate to the child's age and maturity.
>
> (2) On a timely basis, be given access to relevant court and county agency records, reports of examination of the parents or other custodian of the child pursuant to this chapter and medical, psychological and school records.
>
> (3) Participate in all proceedings, including hearings before masters, and administrative hearings and reviews to the degree necessary to adequately represent the child.
>
> (4) Conduct such further investigation necessary to ascertain the facts.
>
> (5) Interview potential witnesses, including the child's parents, caretakers and foster parents, examine and cross-examine witnesses

---

[120]    *Id.* § 6311(a) ("When a proceeding, including a master's hearing, has been initiated alleging that the child is a dependent child under paragraph (1), (2), (3), (4) or (10) of the definition of 'dependent child' in section 6302 (relating to definitions), the court shall appoint a guardian *ad litem* to represent the legal interests and the best interests of the child. The guardian *ad litem* must be an attorney at law.").

[121]    *Id.* § 6302 (paragraph (1) of the definition of dependent child).

and present witnesses and evidence necessary to protect the best interests of the child.

(6) At the earliest possible date, be advised by the county agency having legal custody of the child of:

(i) any plan to relocate the child or modify custody or visitation arrangements, including the reasons therefor, prior to the relocation or change in custody or visitation; and

(ii) any proceeding, investigation or hearing under 23 Pa.C.S. Ch. 63 (relating to child protective services) or this chapter directly affecting the child.

(7) Make specific recommendations to the court relating to the appropriateness and safety of the child's placement and services necessary to address the child's needs and safety.

(8) Explain the proceedings to the child to the extent appropriate given the child's age, mental condition and emotional condition.

(9) Advise the court of the child's wishes to the extent that they can be ascertained and present to the court whatever evidence exists to support the child's wishes. When appropriate because of the age or mental and emotional condition of the child, determine to the fullest extent possible the wishes of the child and communicate this information to the court. . . .[122]

Rule 1154 requires similar duties of GALs.[123] The comment to Rule 1154 specifies

that, if there is a conflict between the duties of the GAL pursuant to paragraphs (7) and

---

[122]    *Id.* § 6311(b). There is a final sentence in Section 6311(b)(9): "A difference between the child's wishes under this paragraph and the recommendations under paragraph (7) shall not be considered a conflict of interest for the guardian *ad litem.*" Importantly, this Court has suspended this sentence to the extent that it conflicts with Pa.R.J.C.P. 1154. *See* Pa.R.J.C.P. 1154, cmt. (citing Pa.R.J.C.P. 1151, 1800 and Pa.R.P.C. 1.7-1.8).

[123]    *See* Pa.R.J.C.P. 1154 (setting forth substantially the same duties for GALs as Section 6311, in addition to specifying in subsection (7) of the rule that GALs must make specific recommendations to the court relating to a child's educational, health care, and disability needs).

(9), the GAL may move the court for appointment as legal counsel and assignment of a separate GAL.[124] "If there is not a conflict of interest," however, the GAL "represents the legal interests and best interests of the child at every stage of the proceedings."[125] "'Legal interests' denotes that an attorney is to express the child's wishes to the court regardless of whether the attorney agrees with the child's recommendation."[126] In contrast, "'[b]est interests' denotes that a guardian *ad litem* is to express what the guardian *ad litem* believes is best for the child's care, protection, safety, and wholesome physical and mental development regardless of whether the child agrees."[127]

The parties misapprehend the function of a GAL under the Juvenile Act.[128] Attorney Langenbach and Defender Association over-inflate the GAL's role by claiming

---

[124] Pa.R.J.C.P. 1154, cmt. Although this Court has not addressed conflicts of interests in dependency cases, we have explained the difference between a child's best and legal interests in a trio of cases concerning termination of parental rights proceedings under the Adoption Act. *See In re Adoption of L.B.M.*, 161 A.3d 172 (Pa. 2017) (plurality); *In re T.S.*, 192 A.3d 1080 (Pa. 2018); *In re K.M.G.*, 240 A.3d 1218 (Pa. 2020). The Superior Court has applied *L.B.M.* to dependency matters. *See In re J'K.M.*, 191 A.3d 907, 916 (Pa. Super. 2018) (remanding for appointment of a separate GAL and the conversion of the current GAL's appointment to legal counsel because the teenage child's wishes diverged from her GAL's recommendations).

[125] Pa.R.J.C.P. 1154, cmt. (citing 42 Pa.C.S. § 6311(b)).

[126] *Id.* If "the wishes of the child cannot be ascertained," such as in the case of a young pre-verbal child, this Court has held that there is no conflict between a child's legal and best interests, and the GAL may continue representing the child without appointment of separate counsel. *T.S.*, 192 A.3d at 1089-90. *T.S.* addresses conflicts under Section 2313(a) of the Adoption Act. The Superior Court has applied the rationale of *T.S.* to dependency cases under the Juvenile Act. *See Int. of A.M.*, 223 A.3d 691, 698 n.7 (Pa. Super. 2019) (holding that a GAL may represent a young, non-expressive child's best and legal interests in a dependency matter because if the child cannot express a preference there is no conflict between legal and best interests).

[127] Pa.R.J.C.P. 1154, cmt.

[128] Neither the parties nor the lower courts acknowledge that Attorney Langenbach's obligations and duties to N.W.M. in the termination of parental rights matter derive from the Adoption Act, an interrelated but wholly different statute from the Juvenile Act. *See* (continued…)

that the GAL is an assistant to, and an arm of, the juvenile court. The argument is extravagant and incorrect. Attorney Langenbach and Defender Association rely upon a multitude of out-of-jurisdiction cases that are of little persuasive value and that involve appointment of GALs in various contexts with differing mandates and functions. Quasi-judicial immunity is based upon function, and there is no universal nationwide function for a GAL.[129] N.W.M.'s argument, on the other hand, is premised erroneously upon the Child Custody Act, a wholly different statute that prescribes differing obligations and functions that apply when a domestic relations judge elects to appoint a GAL.[130]

While guardian *ad litem* means, quite literally, a guardian appointed "for the suit," a proceeding commenced under the Juvenile Act can be quite expansive. One of the purposes of the Juvenile Act is to provide for the "care, protection, safety and wholesome

23 Pa.C.S. § 2313(a) ("The court shall appoint counsel to represent the child in an involuntary termination proceeding when the proceeding is being contested by one or both of the parents."). Based upon the parties' arguments, we focus our discussion of the GAL's function upon the Juvenile Act.

[129] To be clear, our decision today is confined to GALs appointed pursuant to the Juvenile Act. We do not decide today whether a GAL serving other functions in other contexts should be afforded immunity.

[130] *See* N.W.M.'s Br. at 37-38 (erroneously asserting that Attorney Langenbach and Defender Association were appointed pursuant to the Child Custody Act and analyzing a GAL's duties pursuant to 23 Pa.C.S. § 5334 and Pa.R.Civ.P. 1915.11-2). Unlike a dependency GAL, a custody GAL need not be an attorney and the GAL cannot represent a child's legal interests. This Court suspended Section 5334 "insofar as it (1) requires that a guardian *ad litem* be an attorney, (2) permits the guardian *ad litem* to represent both the best interests and legal interests of the child, (3) provides the guardian *ad litem* the right to examine, cross-examine, present witnesses and present evidence on behalf of the child, and (4) prohibits the guardian *ad litem* from testifying." Pa.R.Civ.P. 1915.25. The GAL cannot "provide argument, unsworn opinions, or unsworn testimony to the court," but may provide "sworn testimony," subject to cross-examination, "if called to testify by a party or the court." Pa.R.Civ.P. 1915.11-2(e). Additionally, the GAL "shall prepare a written report" with "specific recommendations relating to the child's best interest," which must be filed as part of the record and provided to the court and parties in advance of the hearing. Pa.R.Civ.P. 1915.11-2(d). Although the GAL is "not an expert witness," the GAL's report must conform to Pa.R.E. 703. Pa.R.Civ.P. 1915.11-2, cmt.

mental and physical development of children" under the statute's purview.[131]   Juvenile

courts are empowered to enter orders regarding the "safety, protection and physical,

mental, and moral welfare of the child" and must regularly review the family's case at

permanency hearings.[132]   Some children are under the juvenile court's purview briefly

before they are reunified, adopted, or discharged to another long-term care arrangement.

Others, particularly those with a permanency goal of "another planned permanent living

arrangement" (*i.e.*, long-term foster care, congregate care, or independent living

arrangements), may remain subject to the juvenile court's jurisdiction for years.[133]

Although a juvenile dependency GAL must be an attorney, the breadth of the

dependency matter and the GAL's statutorily mandated tasks demonstrate that a GAL's

job mixes legal work, social work, and investigative work.   The GAL is tasked with

interacting with children across a span of ages, ranging from pre-verbal children to those

who are on the verge of adulthood.   As a practical matter, a GAL will spend significant

time outside of court investigating the facts inasmuch as children are more limited than

adults in their ability to communicate and to assist in directing the litigation.   Children often

---

[131]    42 Pa.C.S. § 6301(b)(1.1).

[132]    *Id.* § 6351; *see In re Lowry*, 484 A.2d 383, 386 (Pa. 1984) (describing the juvenile court's "broad power" under Section 6351 to act in a "separate discretionary role with the purpose of meeting the child's best interest," not as an adjudicator reviewing the agency's actions); *In re Tameka M.*, 580 A.2d 750, 752 (Pa. 1990) ("The Juvenile Court maintains a continuing plenary jurisdiction in dependency cases."); *see also In re J.M.*, 219 A.3d 645, 651 n.6 (Pa. Super. 2019) (summarizing the different domains of a child's life that the court must address at every hearing pursuant to 42 Pa.C.S. § 6351(f)-(g)).   At a minimum, the juvenile court must conduct a permanency review hearing every six months.   *See* 42 Pa.C.S. § 6351(e)(3).   In accordance with best practice, some judges conduct hearings every three months.   *See* Pa.R.J.C.P. 1608, cmt.

[133]    *See J.M.*, 219 A.3d at 658 (describing how if permanency is not achieved, the focus in a dependency matter tilts towards a "child's well-being independent of the child's parents, such as issues relating to the child's education, healthcare, activities, transition to adulthood, and relationships with siblings, kin, peers, caregivers, and service providers").

cannot or will not describe clearly what happened to them, leaving the GAL to gather information from adults and to decipher whether the adult's perceptions of the facts are skewed by the adult's personal interest.

The recipients of quasi-judicial immunity in this Commonwealth are those serving clear adjudicative functions: administrative law judges who preside over and adjudicate a regulatory matter in the manner of a judge; a judicial law clerk who works within the judicial chambers directly assisting the judge in the judge's adjudicative role; and a child custody officer who directly assists the judge by presiding over a conference and issuing a report and recommendation for the judge's use. Contrary to the argument advanced by Attorney Langenbach and Defender Association that a GAL is an "arm" or "attendant" of the court, supervised by the judge, the judge merely appoints the GAL. The court has the same mandate to appoint an attorney to represent indigent parents.[134]

To be sure, a GAL's responsibility to represent a child's best interests—a position the GAL must advance even if the child disagrees—creates a unique role for the GAL. The position of the child welfare agency or the child's parents may overlap with a child's best interests, but the juvenile dependency GAL is the only attorney at the proceeding exclusively "charged with representation of the legal interests and the best interests of the child."[135] Moreover, the GAL is the only attorney who must decide, in addition to ascertaining the client's position, what the *attorney* believes is best. It is not an easy job.

---

[134] *See* 42 Pa.C.S. § 6337 ("[A] party is entitled to representation by legal counsel at all stages of any proceedings under this chapter and if he is without financial resources or otherwise unable to employ counsel, to have the court provide counsel for him."); *accord Reese v. Danforth*, 406 A.2d 735 (Pa. 1979) (declining to afford public defenders public official immunity; the public has an interest in ensuring the availability of court-appointed counsel to represent indigent criminal defendants, but once the appointment is made, a public defender's public function ceases and he functions as a private attorney serving his client).

[135] *See* 42 Pa.C.S. § 6311(b).

The statutory directive to represent a child's legal and best interests simultaneously at every stage of the proceedings creates responsibility for the GAL to guard against ethical conflicts. Such conflicts may arise because the child's wishes and the GAL's opinion of the child's best interests occur or develop "somewhat nebulously, on a continuum."[136] Even if a child articulates a preference or request, it is not uncommon for a child's inclinations to shift. Rarely is there a single "correct" answer to the question of what final outcome serves a child's best interests, let alone the multitude of decisions that arise as the child ages during the dependency matter. The stakes are high and the clients are vulnerable.

However, even when the juvenile GAL is representing a child's best interests, that GAL's function remains, at its core, the duty to serve as a legal advocate representing the child. Recall that the Juvenile Act and Rules of Juvenile Court Procedure require the GAL to be an attorney-at-law who is "charged with *representation* of . . . the best interests of the child," by expressing "what the guardian *ad litem* believes is best for the child's care, protection, safety, and wholesome physical and mental development regardless of whether the child agrees."[137] The GAL's statutory duties are consistent with the role of a lawyer: meeting with the client; reviewing records; participating in hearings; conducting an investigation to ascertain the facts; interviewing possible witnesses; presenting witnesses and evidence; cross-examining witnesses; ensuring the child welfare agency is keeping the GAL informed; explaining the proceedings to the client; and advising the court of the client's wishes to the extent such wishes are ascertainable.[138] The GAL does these things not to benefit the juvenile court, but "to adequately represent the child," "to

---

[136] *K.M.G.*, 240 A.3d at 1236.

[137] *See* 42 Pa.C.S. § 6311; Pa.R.J.P. 1154.

[138] 42 Pa.C.S. § 6311(b)(1)-(6), (8)-(9).

protect the best interests of the child," and "to address the child's needs and safety."[139] The GAL is doing the work of a lawyer, not the work of a judge. Nor is the GAL judge-adjacent.

Of the nine duties listed in Section 6311, the duty that differs the most from a traditional lawyer-client relationship is the mandate in Section 6311(b)(7) to "[m]ake specific recommendations to the court relating to the appropriateness and safety of the child's placement and services necessary to address the child's needs and safety."[140] Unlike the circumstances that apply when a GAL is appointed under the Child Custody Act, neither the Juvenile Act nor the Rules of Juvenile Court Procedure dictate the procedure for how the GAL must offer the recommendation to the court.[141] Bear in mind that the GAL offers this recommendation in connection with proceedings where the GAL has a statutory duty to present evidence.[142] The GAL does not serve as a judicial assistant or adjudicator of the dispute. Instead, the GAL provides the recommendation as an *advocate* for the child's best interests. The allegations in N.W.M.'s complaint relate to Attorney Langenbach's best interests advocacy on behalf of N.W.M. Although it is different from advocacy for a client's legal interests, advocacy for a client's best interests serves to protect the child in ways that a child, because of his or her minor age, maturity, and development, cannot do by himself or herself.

---

[139]    *Id.* § 6311(b)(3), (5), (7).

[140]    *Id.* § 6311(b)(7).

[141]    *Cf.* 23 Pa.C.S. § 5334(b)(6) (provision of the Child Custody Act requiring the GAL to "make specific recommendations in a written report to the court relating to the best interests of the child," which shall become part of the record and is subject to comment by the parties).

[142]    *See* 42 Pa.C.S. § 6311(b)(5), (9) (directing the GAL to "present witnesses and evidence necessary to protect the best interests of the child" and to "present to the court whatever evidence exists to support the child's wishes").

In Pennsylvania, the juvenile GAL also is tasked with representing the legal interests of the child. In that role, the GAL is no different than any other lawyer. Like a public defender, a GAL acts in the private interest of the child and advocates in service of the child's preferences. Attorney Langenbach and Defender Association minimize the legal interests portion of the GAL's role. In the present case, there is no distinction between Attorney Langenbach's best interests and legal interests roles because N.W.M. was unable to express her preferences.[143] But the legal interests role may feature more prominently in other dependency cases.

Like the Connecticut Supreme Court in *Carrubba v. Moskowitz*, the trial court in the instant case compared the purpose of the Juvenile Act—to provide for the care, protection, safety, and development of children—with the GAL's best interests role, which is to express what the GAL believes is best for the child's care, protection, safety, and development. From this, the trial court reasoned that the GAL's role as an "advocate" is subordinated to "the role of assisting the court in its goal of protecting the best interests of the child."[144] Neither the Juvenile Act nor the Juvenile Court Rules of Procedure prioritize advocacy of the child's best interests over the advocacy of the child's legal interests. In the event that these two interests conflict, the child is entitled to legal counsel *and* a GAL.[145] The protection of the child's legal interests gives the child a voice and allows the judge to consider the child's own opinion. A GAL's belief about the best

---

[143]  *See supra* n.126.

[144]  Tr. Ct. Op. at 11-12 (citing *Carrubba*, 877 A.2d at 783).

[145]  *See* Pa.R.J.C.P. 1154, cmt.

interests of a child is just that—the GAL's belief. It is the court, and not the GAL, that makes the ultimate determination.[146]

Although a GAL may assist the judge, a GAL is not an assistant to the judge. Like all attorneys who are "officers of the courts" and who "have obligations and responsibilities with respect to the courts," the GAL brings certain information to the court.[147] That obligation is derived partially from the Rules of Professional Conduct and partially from the Juvenile Act.[148] All advocacy is designed to bring the client's position to the court's attention so that the court can do its job of deciding the ultimate legal issue.[149] County solicitors, parent advocates, legal counsel appointed to represent children, and GALs all have the ability to introduce evidence or recommend proposed outcomes to the juvenile court. Each attorney in the proceeding contributes to the juvenile court's mission of fulfilling the Juvenile Act's goals. Significantly, the Juvenile Act has other goals beyond protecting and caring for children, including preserving the unity of the family, separating

---

[146]    *See* 42 Pa.C.S. § 6351 (describing the duties of the juvenile court). Additionally, in a "dependency proceeding, which is always without a jury, the judge or master carries a[n] . . . active role. Because of the Doctrine of *Parens Patriae*, he must focus on the best interest of the child and must be involved to the extent of requiring production of reports, evidence or more exhaustive testimony when he is not satisfied *the parties* have presented a complete case." *Matter of J.P.*, 573 A.2d 1057, 1064 (Pa. Super. 1990) (*en banc*) (emphasis added).

[147]    *Accord Fox v. Wills*, 890 A.2d 726, 734 (Md. 2006) (holding that an attorney appointed to represent a child in a custody matter is not an "arm of the court" and does not perform a "judicial" function more so than any other attorney because "all Maryland attorneys are officers of the courts and have obligations and responsibilities with respect to the courts.").

[148]    *See* 42 Pa.C.S. § 6311(b)(3), (5), (7), (9).

[149]    *See* Pa.R.P.C. 3.3, cmt. ("A lawyer acting as an advocate in an adjudicative proceeding has an obligation to present the client's case with persuasive force.").

a child from family only when necessary, and ensuring that parties receive a fair hearing and that their constitutional and other legal rights are recognized and enforced.[150]

As to Attorney Langenbach's and Defender Association's argument that, without the GAL, the court will be deprived of certain information, Appellants overlook the role of the Court-Appointed Special Advocate ("CASA"). The Juvenile Act gives the court the discretion to appoint a CASA in any case. The CASA need not be an attorney. There is some overlap of duties between a GAL and a CASA. A CASA has broad access to records concerning the child, must interview the child and others, and must receive information concerning hearings, meetings, and placement changes. Unlike a dependency GAL, a CASA is tasked with submitting "written reports to the court to assist the court in determining the disposition best suited to the health, safety, and welfare of the child."[151] The General Assembly has expressly provided some immunity to CASAs, while declining to do so for GALs.[152] This disparate treatment indicates that the General Assembly did not intend the GAL to function as an arm of the court, and it is a treatment that the lawmakers are well within their authority to prescribe.

While malpractice cases against GALs may be rare, the emotional nature of the issues at stake in family court may nonetheless pose a risk of malpractice litigation by distraught parents. Nevertheless, GALs have been abiding by their statutory and ethical duties to act independently, and have done so without any guarantee of immunity. Furthermore, the nebulous continuum of a child's best interests is exactly what will make it difficult for most plaintiffs to prove that a GAL failed "to exercise ordinary skill and

---

[150]     42 Pa.C.S. §6301(b).

[151]     42 Pa.C.S. § 6342(d)(5).

[152]     CASAs are entitled to civil immunity "for actions taken in good faith to carry out the duties of the CASA under this chapter except for gross negligence, intentional misconduct or reckless, willful or wanton misconduct." 42 Pa.C.S. § 6342(b).

knowledge" or that "such negligence was the proximate cause of damage to the plaintiff."[153]

Juvenile dependency GALs fulfill a public need by providing a voice for society's most vulnerable. A dependency GAL is a lawyer with professional responsibilities to the client pursuant to the Rules of Professional Conduct. It is counterintuitive to insist that eliminating the possibility of malpractice suits is the way to incentivize proper representation of a child. Like adults, children deserve competent representation, as well as recourse if they do not receive it.

## IV.    Conclusion

GALs in juvenile dependency cases serve to protect the child by advocating for the child's best interests and non-conflicting legal interests. Although dependency GALs serve a unique role that differs from that of other attorneys, they do not operate as an arm of the court. GALs do not differ in kind from attorneys providing other court-appointed legal services to fulfill a public need. All appointed attorneys have ethical obligations to their clients. Based upon their function, we decline to provide categorical and absolute quasi-judicial immunity to GALs in juvenile dependency cases. Furthermore, we conclude that the Superior Court is authorized to address novel as well as routine legal issues, and cases involving "policy" considerations as well as those of a more pedestrian nature. As always, this Court sits to review intermediate tribunals' decisions according to well-established rules and procedures. That is no cause for abstention by the lower courts in

---

[153]    *Rizzo v. Haines*, 555 A.2d 58, 65 (Pa. 1989) (setting forth elements of a legal malpractice claim).

the meantime. We affirm the Superior Court's order reversing the trial court, and we remand for further proceedings consistent with this opinion.

Chief Justice Todd and Justices Donohue, Dougherty, Mundy and Brobson join the opinion.

Justice Brobson files a concurring opinion.